

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED     **Aug 24 2022**

CAROL L. MICHEL
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TORSH INC., | * | CIVIL ACTION   22-2862 |
| | * | NO. |
| Plaintiff, | * | |
| | * | |
| VERSUS | * | SECTION " "  J |
| | * | JUDGE   Barbier |
| AUDIO ENHANCEMENT, INC., | * | |
| | * | |
| | * | MAG. DIV. (2) |
| Defendant. | * | MAG. JUDGE  Currault |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT

NOW COMES plaintiff, Torsh Inc. ("Torsh"), and in support of its Complaint against defendant, Audio Enhancement, Inc. ("AE"), respectfully states as follows:

### INTRODUCTORY STATEMENT

This Complaint seeks damages and injunctive relief associated with AE's breach of the contract between the parties and its theft and misappropriation of Torsh's trade secrets and confidential, proprietary information. Torsh seeks damages and injunctive relief associated with AE's breaches of the contract between the parties, as provided under that agreement, as well as under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA").

Founded in 2011 and based in New Orleans, Louisiana, Torsh is a software development company whose core mission is to improve student outcomes by increasing and enhancing instructor effectiveness through the collection of data and the provision of a software platform that facilities expert coaching. Torsh's primary product is TORSH Talent, a cloud-based professional

___Fee _____
___Process_____
___Dktd _____
___CtRmDep _____
___Doc. No _____

learning platform that, among other things, enables schools and organizations to support educator growth throughout the entire development cycle of assessment, observation, feedback, goal setting, and coaching. The product consists of an iOS mobile application, an Android mobile application, and a web application, and it is marketed to schools and organizations in K-12, higher education, and early education. AE, on the other hand, is a much larger, Utah-based company that specializes in classroom audio and video systems. AE – historically – did not develop or offer the kinds of technology, software, and capabilities found in and delivered via Torsh's TORSH Talent platform. Beginning in and around 2016, however, AE approached Torsh about a possible collaboration whereby AE could tap into and harness Torsh's technology to improve its own product offerings.

In early 2019, following several years of communications and back-and-forth regarding a possible business relationship, Torsh and AE joined forces to offer a fully integrated platform consisting of a camera, camera management software, and access to a white-labeled version of certain TORSH Talent components and features, including web and mobile file storage, connectivity, platform management, and data aggregation and measurement services, all of which was to be bundled into a co-branded "Integrated Solution." The Integrated Solution relied on Torsh's mobile Application Programming Interface ("API") to connect AE's physical cameras that were located in classrooms with Torsh's cloud-based professional learning platform which provided teachers, coaches and school administrators easy access to thousands of recorded videos and other digital artifacts from anywhere, twenty-four (24) hours a day, seven (7) days per week. The parties memorialized their relationship and agreement in a Business Services and Software

Resale Agreement, dated February 22, 2019, as amended (collectively, the "Agreement").[1]  Under the Agreement, Torsh agreed to provide AE and its customers, for the term of the Agreement, a limited, non-exclusive, and non-transferrable license to access and use its technology and services (the "TORSH Services," defined further below) as well as its marks and other identifiers (together with the "TORSH Services," the "TORSH IP") in connection with and for purposes of the Integrated Solution.  In exchange, AE agreed to pay Torsh specified fees and, among other things, market and promote the Integrated Solution, provide associated support services, and handle billing and invoicing for the Integrated Solution.

Pursuant to the Agreement, AE specifically agreed to promote the Integrated Solution as its "exclusive offering containing a professional learning or professional development software platform component" (Agreement, § 2.1) and that it would not "engage in any unfair, anti-competitive, misleading, or deceptive practices with respect to the TORSH Services."  (*Id.* at § 2.8).  AE further agreed that "AE will not, and will not permit others (including any Customers) to reverse, engineer, disassemble, decompile, decode, or adapt any software within the definition of TORSH IP, or otherwise attempt or derive or gain access to the source code or algorithms of the TORSH IP, in whole or in part," except as permitted by law or the licenses granted under the Agreement.  (*Id.* at § 4.3(a)).  The parties mutually agreed to maintain each party's respective confidential and propriety materials and information.  (*Id.* at § 7.1).

---

[1] True and correct copies of the Business Services Software and Resale Agreement, dated February 22, 2019; Amendment #1 to Business Services and Software Resale Agreement, dated February 22, 2019, and Torsh Services Order Form Amendment, dated February 22, 2020 (collectively, the "Agreement"), are attached as **EXHIBIT "1,"** *in globo.*

Pursuant to Section 6.1 of the Agreement, the parties agreed to an initial term of three years, which would automatically renew for successive one-year terms unless terminated in writing at least 90 days prior to the expiration of the then-current term.  (*Id.* at § 6.1).  Notably, even in the event the parties were unable to agree on pricing for a subsequent term and the Guaranteed Minimum Purchase amount provided under the Agreement, the parties still agreed to be bound by the 90-day written notice requirement.  (*Id.*)

Access to the TORSH Services and TORSH IP proved quite profitable, so much so that, two years into the parties' relationship under the Agreement, AE approached Torsh about possibly acquiring the company.  But those discussions were not productive, as AE indicated that its valuation and offer would be based on Torsh's earnings and cash flow as opposed to a multiplier of revenue and its high growth potential, resulting in a significantly lower price than Torsh would have been able to obtain from other third parties.  With an acquisition unobtainable, it is at this point, upon information and belief, that AE began to use its access to the TORSH Services and TORSH IP to instead reverse engineer and use Torsh's technology and proprietary information to develop a competing software platform and suite of services.  Meanwhile, AE gave every indication of allowing the Agreement to renew on its own terms, though it avoided reaching an agreement on pricing and its Guaranteed Minimum Purchase obligation for the subsequent term. AE avoided engaging in any more substantial renewal conversations.  It also avoided showing Torsh the platform it was working on, which, upon information and belief, was being built and developed using Torsh's technology and proprietary information.

By letter dated February 11, 2022, Torsh reminded AE of the Agreement's upcoming automatic renewal, and in accordance with the Agreement, provided AE with an invoice for the

subsequent term beginning February 22, 2022, in the amount of $150,050.00, reflecting the pricing and AE's "Guaranteed Minimum Purchase" obligations under the Agreement for the prior three years. This was exceptionally generous given that, at the time, the number of Torsh sublicenses actually being used by AE's customers supported an invoice of $356,451.00 based on the previously agreed-upon pricing. Unnerved by AE's avoidance of an agreement concerning pricing, and having become aware that AE had been working to develop a competing software platform, Torsh also reminded AE of its intellectual property rights and AE's obligation to safeguard the confidentiality of Torsh's information and materials and promote the Integrated Solution as its exclusive offering. AE did not immediately respond.

Instead, on February 21, 2022, AE's Vice President Tom Dobson wrote to Torsh by email purporting to terminate the Agreement "as of today." The email did not identify a basis for the purported termination, nor did it deny AE's development of a competing software platform. But by letter from its counsel dated February 22, 2022, AE insisted that the parties' failure to agree on pricing and a Guaranteed Minimum Purchase amount for the subsequent term meant that there was "no enforceable contract" between the parties. AE further refused to pay Torsh's February 11, 2022, invoice, stating that it "consider[ed] the Agreement terminated" with Mr. Dobson's email of February 21, 2022. Notably, AE again did not deny its development of a competing software platform; it simply claimed not to have reverse engineered Torsh software and technology to create that platform or to have created a "derivative work" of Torsh's proprietary material. Torsh subsequently attempted – in good faith – to confer with AE regarding its obligations and breaches, without success, forcing Torsh to file this lawsuit.

## I.    PARTIES

1.    Plaintiff, Torsh, is a Delaware corporation with its principal place of business at 701 Loyola Avenue, Unit 52377, New Orleans, Louisiana 70152.

2.    Defendant, AE, is a Utah corporation with its principal place of business at 9858 S. Audio Drive, West Jordan, Utah 84081.  AE does business in Louisiana and solicits, has and/or services customers in Louisiana, as evidenced by its engagement of sales representatives devoted to Louisiana and attendance at and participation in industry-specific conferences and conventions in Louisiana.

## II.    JURISDICTION AND VENUE

3.    This is an action for breach of contract and misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. ("DTSA"), all arising from AE's intentional breaches of the Agreement between the parties and its theft and misappropriation of Torsh's trade secrets and confidential, proprietary information.

4.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as it involves a federal question, and under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states. This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a) because they are substantially related to the claims that arise under the DTSA and, furthermore, because both the state and federal claims are derived from a common nucleus of operative facts and considerations of judicial economy dictate that the state and federal issues be consolidated for a single trial.

5.      This Court has personal jurisdiction over AE based on its sufficient contacts with the State of Louisiana and because the claims herein directly arise out of AE's contacts with the State of Louisiana.  Among other things, AE purposefully directed its activities towards Louisiana in soliciting and negotiating a business relationship with Torsh, a New Orleans company, and the parties' relationship and Agreement was forged and negotiated largely via phone calls and email communications between AE management and Torsh CEO Courtney Williams, who resides and is located in New Orleans.  In addition, the Torsh technology, trade secrets, and proprietary information to which AE was provided access under the Agreement, and which, upon information and belief, AE misappropriated and reverse engineered to develop a competing platform, was generated and developed in New Orleans, Louisiana.

6.      AE solicits and/or currently has and/or services customers in Louisiana, as evidenced by its engagement of sales representatives devoted to Louisiana.  At one time, AE maintained a physical office in this District.  Upon information and belief, AE has marketed and sold and/or attempted to sell its competing platform to customers in Louisiana and has otherwise breached its contractual obligations to Torsh in the Louisiana market.

7.      As further evidence of AE's activities directed at Louisiana, AE attends and participates in industry-specific conferences and conventions in Louisiana at which it solicits new customers and business and, upon information and belief, forges new business relations.  For example, AE recently participated in ITSE Live in New Orleans, an industry conference hosted by the International Society of Technology in Education ("ITSE"), at which AE exhibited its products and technology to conference attendees.

8.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted herein occurred in this District and/or because a substantial part of the property that is the subject of this action is situated in this District.

### III.    FACTUAL BACKGROUND

*A.    Torsh's Business and Proprietary Services and Products*

9.      Founded in 2011, Torsh is a software development company whose core mission is to improve student outcomes by increasing and enhancing educator instructional effectiveness.

10.      As noted above, Torsh's primary product is TORSH Talent, a cloud-based professional learning platform that, among other things, enables schools and organizations to support educator growth throughout the entire development cycle of assessment, observation, feedback, goal setting, and coaching.  The platform is marketed to and used by all levels of educational institutions and organizations.

11.      The TORSH Talent platform includes a host of capabilities and features, including file storage, connectivity, management, mobile API, and data aggregation and management services, which allow users to catalog captured data and videos, evaluate educator performance, and create useful reports and other materials for tracking performance, setting goals, coaching, and facilitating peer learning and collaboration.  As a technology product, TORSH Talent consists of an iOS mobile application, an Android mobile application, and a web application.

12.      Torsh invested substantial time and resources into developing TORSH Talent and its proprietary API's, which allow TORSH Talent to effortlessly integrate with other platforms,

8

including Canvas, Blackboard, and Sakai. In addition, Torsh has developed an API that allows TORSH Talent to integrate with video camera devices and camera management software.

13.        TORSH Talent and Torsh's other technology, trade secrets, and proprietary information was generated and developed in New Orleans, Louisiana. The majority of Torsh's product and software engineers are located in and work in New Orleans, Louisiana.

14.        Due to its impressive features and user-friendly interface, TORSH Talent has been referred to as the "Porsche" of video-based observation tools. It is widely used by K-12 school districts across the country, by graduate-level teaching programs, and in early education programs nationwide. For example, a number of county-level school districts use TORSH Talent as a way to remotely observe new teachers during their induction phase and offer feedback to teachers over the course of the school year. A number of premier graduate schools use TORSH Talent as a teaching tool for students enrolled in their teacher education programs.

       *B.*    *Torsh's Relationship with AE and the Agreement Between the Parties*

15.        While the TORSH Talent platform includes a host of features and capabilities such as file storage, connectivity, management, mobile API, and data and aggregation and measurement services, it does not offer a camera.

16.        AE is a company specializing in network-based classroom audio and camera systems. AE historically did not offer the kinds of technology and services developed by Torsh and included in the TORSH Talent platform.

17.        Beginning in or around early 2016, AE reached out to Torsh about a possible collaboration between the two companies that would allow AE to harness and incorporate Torsh's technology into its own camera technology to offer a more integrated, comprehensive product. AE

requested a demo of Torsh's capabilities, which Mr. Williams provided to AE via videoconference from New Orleans, Louisiana.

18.     This inquiry and demo kicked off a series of meetings and correspondence – largely via phone and email – over the next three years that culminated in the parties' 2019 Agreement.

19.     In early 2019, Torsh and AE formally joined forces to offer an "Integrated Solution" that combined AE's traditional classroom camera system with the services and capabilities of Torsh's proprietary software platform.   On or about February 22, 2019, they executed the Agreement attached hereto as Exhibit "1."

20.     Pursuant to the Agreement, Torsh granted to AE and its customers, for the term of the Agreement, a limited, non-exclusive, and non-transferrable license to access and use its technology and services (the "TORSH Services," as specifically defined in Exhibit A to the Agreement) as well as its marks and other identifiers (the "TORSH Marks," and together with the TORSH Services, the "TORSH IP") in connection with and for purposes of the Integrated Solution, which was intended to be a co-branded platform.  (*See* Agreement, §§ 1, 3.1).

21.     In return, AE agreed to market and demonstrate, resell, sublicense, and otherwise distribute and make available the Integrated Solution, as well as to perform support services related to the platform (*See* Agreement, § 2.1).  Pursuant to Section 2.1 of the Agreement, AE specifically agreed to "promote the Integrated Solution as AE's exclusive offering containing a professional learning or professional development software platform component." (*Id.*).  AE further agreed that it would not "engage in any unfair, anti-competitive, misleading, or deceptive practices with respect to the TORSH Services."  (*Id.* at § 2.8).

22.     As set forth in Exhibit A to the Agreement, AE was to receive 1,000 Customer Sublicenses per year, starting with the period of February 22, 2019, to February 21, 2020.  (*See* Agreement, at Exhibit A).  For these Sublicenses, AE was to pay Torsh a minimum amount of $100,000.00 annually (the "Guaranteed Minimum Purchase"), with additional amounts to be paid for additional licenses and add-on services.  (*See id.* at Exhibit B).  Exhibit "B" to the Agreement also set forth terms for AE's purchase of Sublicenses, separate and apart from the Guaranteed Minimum Purchase.  (*See id.*).

23.     Pursuant to Section 4.1(a) of the Agreement, AE specifically acknowledged and agreed that "it receives no ownership rights in the materials, data, or records furnished by TORSH and the TORSH IP, including the TORSH Services," as those terms are defined in the Agreement. (*See* Agreement, § 4.1(a)).  AE further acknowledged and agreed that "neither AE nor Customers receive any ownership rights in or to the TORSH IP."  (*Id.* at § 4.2(a)).

24.     Critically, the licenses provided by Torsh under the Agreement were subject to the following restrictions:

> (a)     Except as expressly permitted by this Agreement, or as reasonably necessary to make use of the Integrated Solution, **AE will not, and will not permit others (including any Customer), to reverse engineer, disassemble, decompile, decode, or adapt any software included within the definition of TORSH IP, or otherwise attempt to derive or gain access to the source code or algorithms of the TORSH IP, in whole or in part**, except to the extent (i) this restriction is prohibited by applicable law; (ii) such action is taken for purposes of ensuring or assessing interoperability or otherwise qualifies as a "fair use" under the Copyright Act (title 17 of the U.S. Code) or other applicable law; or (iii) such action is permitted under the applicable license for any open source software included in the TORSH IP.

> (b)     Except as expressly permitted by this Agreement, **AE will not, and will not permit others (including any Customer) to, modify, correct, adapt, translate, enhance, or otherwise prepare or create any**

**derivative works or improvements of the TORSH Services.**  For the sake of clarity, the Parties agree that AE's integration of, or development of an interface between, the TORSH Services with and into the Integrated Solution, and any modification of the TORSH Services or any TORSH License will not be deemed to be a derivative work and will be owned, as between the parties, by TORSH.

(Agreement, § 4.3) (emphasis added).

25.     Torsh and AE also anticipated that they would be sharing confidential and proprietary materials and information ("Proprietary Materials") with each other in connection with the Agreement.  (*See* Agreement, § 7).  Therefore, the parties agreed that "[a]ll material and information provided by one Party (the 'Discloser') to the other (the 'Recipient') relating to the business, policies, procedures, customs and forms of the Discloser or any of its affiliates, including but not limited any trade secrets and other valuable proprietary information of the Discloser or its third party vendors discoverable by the Recipient through access to or use of the Integrated Solution, shall constitute Proprietary Information of the Discloser for purposes hereof." (Agreement, § 7.1(a)).

26.     To protect against misuse of such Proprietary Materials, the parties agreed as follows:

> (b) The Recipient **shall maintain the confidentiality of the Discloser's Proprietary Information in the strictest confidence and will not disclose the Recipient's Proprietary Information without the written consent of the Discloser, except as is reasonably necessary in order to perform the Recipient's obligations under this Agreement.** The Recipient shall only disclose the Discloser's Proprietary Information to Recipient's employees or contractors who are required to have the information for the purposes of carrying out Recipient's obligations under this Agreement, and only to employees and contractors that have previously signed an agreement in content similar to the provisions hereof.

(Agreement, § 7.1(b) (emphasis added)).[2]

27.    Pursuant to Section 16 of the Agreement, the parties agreed that "[t]his Agreement is to be construed in accordance with and governed by the internal laws of the State of Delaware, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of Delaware to the rights and duties of the Parties." (Agreement, § 16).

28.    Additionally, the Agreement provides that "[t]he Parties agree that irreparable injury would occur if this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to equitable relief, including injunctive or specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity." (Agreement, § 7.3).

29.    As to attorneys' fees, the parties agreed that "[t]he prevailing Party in any dispute resolution will be entitled to collect reasonable attorney's fees from the non-prevailing Party." (Agreement, § 5).

30.    Pursuant to Section 19 of the Agreement, "the Parties agree that the terms of Sections 2.4, 4, 6.3, 7, 8, 9, 11, 15, 16, 17, 18 and 19 shall survive" termination of the Agreement. (Agreement, § 19). This survival provision includes, among other things, the prohibition against reverse-engineering or creating derivative works of the TORSH IP (§ 4), as well as the Agreement's confidentiality provisions (§ 7).

---

[2] Section 7.1(b) also provides that "[e]ach Party shall also keep confidential the terms of this Agreement and/or any exhibits and schedules attached hereto." (Agreement, § 7.1(b)). Accordingly, Torsh has filed this Complaint and its Exhibits under seal.

31.     The "Initial Term" of the Agreement was three years beginning on February 22, 2019. (Agreement, § 6.1). By its terms, "[t]his Agreement will automatically renew at the end of the Initial Term for successive one-year terms (together with the Initial Term, the 'Term') unless either Party terminates the Agreement by providing the other Party with written notice of its intent to terminate at least ninety (90) days prior to the expiration of the then-current term (the 'Termination Notification Date'), or unless this Agreement has been earlier terminated pursuant to Section 6.2." (*Id.*). AE and Torsh further agreed that "[i]f the Parties cannot mutually agree upon the pricing and Guaranteed Minimum Purchase mount [*sic*] set forth in Exhibit B for the subsequent renewal term by the Termination Notification Date, then either Party shall have the right to terminate the Agreement by providing the other Party with written notice of its intent to terminate no later than the Termination Notification Date." (*Id.*). Under this Section, the Agreement automatically renewed if no written notice of intent to terminate was provided by the Termination Notification Date, *i.e.*, 90 days before the end of the then-current term. (*See id.*).

32.     Almost immediately, Torsh and AE entered into that certain Amendment #1 to Business Services and Software Resale Agreement, effective as of February 22, 2019, the same date as the original Agreement itself. (*See* Agreement, at Exhibit D).

33.     Pursuant to Amendment #1, Torsh and AE revised the number of Customer Sublicenses and the Guaranteed Minimum Purchase amount such that AE was to receive 3,001 Customer Sublicences for the period of February 22, 2019, to February 21, 2020, and AE was to pay a Guaranteed Minimum Purchase equal to $150,050.00 for Year One of the Term. (Agreement, at Exhibit D). The Parties ratified all other terms and conditions of the Agreement, which were to remain in full force and effect. (*See id.*).

14

34.     Effective February 22, 2020, Torsh and AE entered into a second amendment entitled "Torsh Services Order Form Amendment," a true and correct copy of which is included in Exhibit "1." This Amendment revised the number of Customer Sublicenses and the Guaranteed Minimum Purchase for Years 2 and 3 of the Agreement, such that AE was to receive 3,001 Customer Sublicenses for each year and was to pay a Guaranteed Minimum Purchase equal to $150,050.00 for each year. (*Id.*).

C.     *AE Realizes the Value and Profit-Making Potential of Torsh's Technology and Begins to Develop Its Own Competing Software and Services.*

35.     The relationship between Torsh and AE ran relatively smoothly during the first two years of the Agreement. Pursuant to the Agreement, Torsh provided AE with Customer Sublicenses, and AE marketed and sold the Integrated Solution to customers. AE paid Torsh the following amounts, as provided in the Agreement:

    a.     February 22, 2019 – February 21, 2020: $150,050.00.

    b.     February 22, 2020 – February 21, 2021: $288,295.00.

    c.     February 22, 2021 – February 21, 2022: $445,488.48.

36.     Nonetheless, AE quickly realized the money-making potential of the parties' collaboration and, more so, its ability to offer an integrated offering on its own.

37.     Pursuant to Section 3.1 of the Agreement, the parties agreed that the Integrated Solution "shall be co-branded and accompanied by co-branded marketing materials that identify the TORSH Services in all instances as, at the very least, 'powered by TORSH' (e.g., 'AE Learning Platform (powered by TORSH)')." (Agreement, § 3.1). AE agreed to submit to Torsh for its approval "all elements of any advertising or marketing materials related to the Integration Solution." (*Id.*).

15

38.      While AE initially provided Torsh with mock-ups showing co-branded webpages, it quickly moved towards AE-branding only, increasingly burying all references to Torsh in violation of its obligations under the Agreement.

39.      Also under the Agreement, AE had access to considerable confidential and proprietary information and trade secrets belonging to Torsh.  Specifically, AE had access to Torsh's web API, which connected the physical camera in the classroom to the TORSH Talent platform.  Torsh also shared detailed, confidential information and trade secrets with AE's development team regarding how the API was optimized to enable the transfer of large video files and how the larger files could be effectively stored without jeopardizing software functionality or speed for the end-user.  In addition, Torsh built custom applications for AE and its customers and shared confidential and trade secret wireframes regarding their functionality.

40.      Torsh takes considerable and reasonable steps to ensure that its confidential and proprietary information and trade secrets are protected from disclosure.  For example, Torsh requires its employees to abide by confidentiality and non-disclosure obligations.  Torsh also protects its confidential and proprietary information and trade secrets by granting access only to employees who need the specific information in order to fulfill their duties and responsibilities for Torsh.  Torsh requires all employees to input unique and confidential usernames and passwords in order to access the information on their password-protected, Torsh-issued computers, email system, software, document management systems, and other internal databases.

41.      In addition, Torsh requires vendors who might have access to its confidential and proprietary information and trade secrets – like AE – to abide by confidentiality and non-disclosure obligations.  (*See, e.g.,* Agreement, § 7).

42.     Realizing the increased profit potential of bringing the technology and services provided by Torsh in-house, in early 2021, AE approached Torsh about a possible acquisition. That discussion was not productive, as AE indicated that its valuation and offer would be based on Torsh's earnings and cash flow as opposed to a multiplier of revenue and its high growth potential, resulting in a significantly lower price than Torsh would have been able to obtain from other third parties.

43.     At that point, upon information and belief, AE turned to developing a product and software that could instead compete with Torsh.

44.     Upon information and belief, in order to develop competing services and capabilities, AE accessed and utilized Torsh's trade secrets and confidential and proprietary information and materials.

45.     In or about the fall of 2021, AE and Torsh engaged in discussions regarding a new contract with revised terms, characterized as a possible "renewal agreement."  These discussions were not successful.  Nevertheless, AE did not seek to terminate the Agreement.

46.     Also in an around the fall of 2021, AE expressed to Torsh its interest in expanding its presence in Louisiana with more sales representatives in the state.

47.     Upon information and belief, AE did not seek to terminate the Agreement because it was using its continued access to Torsh's trade secrets and proprietary information to reverse-engineer Torsh's technology and develop its own competing products and services while using the Agreement as a back-up solution in the event it was unable to bring its competing software and services online in a timely fashion.

48.    In or about January 2022, during the Initial Term of the Agreement, AE sent an

email to users of the Integrated Solution, which stated as follows:

Dear VIEWpath user,

Audio Enhancement is excited to announce that we are updating our
VIEWpath platform and will be transitioning to a new video repository.
Developed with teacher feedback, this new platform and repository – *My
Workshop* – has a clean look and many easy-to-use features.

Upgrading to the new platform is a great opportunity to identify and save
those videos that you wish to keep.  Videos on the current platform will
need to be downloaded by the owner of the video and stored locally.  To
assist with this process, we have included a link and images below that will
help teachers download any videos they want to keep.  Any videos that
teachers do not wish to download and store may be deleted, or simply
ignored.  This process will need to be completed by February 18th.  After
February 18th, existing videos will be unavailable.

A member of our Customer Success Team will be reaching out to you before
February 21.  They will provide you with the updated log in information
and any support needed to upgrade to the My Workshop platform.
Upgrading is as simple as logging in to the new platform using your new
log in information. The My Workshop platform is intuitive and easy to use.
Our Customer Success Team will provide you with training resources and
support.  If you have any questions, please reach out to our Customer
Success Team at CustomerSuccess@AudioEnhancement.com.

Thank you for choosing VIEWpath.  We appreciate your continued
partnership and support.

49.    Notably, My Workshop was a trade name developed though considerable back-

and-forth between AE and Torsh.  When rolled out, however, My Workshop reflected no co-

branding whatsoever.

50.    Moreover, as clear from AE's January 2022 email, My Workshop reflects a clear

attempt and design by AE to cut Torsh out of the offering and to begin pushing a competing

technology and platform, all in plain, willful violation of its obligations under Sections 2.1

(exclusive offering) and 2.8 (non-competition) of the Agreement.

51.      In addition, upon information and belief, considering the timing of AE's release of the new My Workshop platform, AE's access to Torsh's confidential and proprietary information, and AE's characterization of the My Workshop platform as being developed using "teacher feedback," presumably as it relates to the Integrated Solution, AE developed the My Workshop platform using Torsh's trade secrets and confidential and proprietary information, in violation of both the Agreement (§§ 4.3, 7.1) and federal law.

52.      But despite the above-referenced activities, AE did not send Torsh written notice of its intent to terminate the Agreement by the Termination Notification Date, *i.e.*, 90 days before February 21, 2022.  In fact, AE did not send Torsh written notice of its intent to terminate the Agreement at any point prior to February 21, 2022.

53.      On February 22, 2022, the Agreement automatically renewed for a one-year term.

54.      In anticipation of the Agreement's renewal and based on reports that AE might be working on its own competitive professional learning or professional development software platform component, on February 11, 2022, counsel for Torsh sent AE a letter reminding AE of the forthcoming renewal and AE's obligations under the Agreement, a true and correct copy of which is attached as **EXHIBIT "2."**

55.      Also on February 11, 2022, in accordance with the Agreement, Torsh sent AE an invoice for the one-year period of February 22, 2022, to February 21, 2023.  Based on the Guaranteed Minimum Purchase and minimum number of Customer Sublicenses provided for under the Agreement for the previous three years, Torsh invoiced AE for 3,001 Customer Sublicenses at a rate of $50/license, for a total amount of $150,050.00.  A true and correct copy of the February 11, 2022, invoice is attached as **EXHIBIT "3."**

56.     In fact, while the February 11, 2022, invoice only purported to charge AE for 3,001 Customer Sublicenses, as of February 11, 2022, AE and the sublicensees were using 7,129 Customer Sublicenses.  At a rate of $50/license, AE was thus obligated to pay Torsh $356,451.00 for the upcoming year.  Each of these Customer Sublicenses remained in AE's online account with Torsh and available to AE to be assigned to users, as had occurred in each of the previous three years.

57.     AE did not immediately respond to Torsh's invoice or the letter from its counsel. Instead, on February 21, 2022, AE Senior Vice President Tom Dobson wrote to Torsh by email stating – for the first time – that AE intended to terminate the Agreement and that, in fact, it considered the Agreement terminated "as of today."

58.     Pursuant to Section 6.1 of the Agreement, Mr. Dobson's email was not effective to terminate the Agreement.  Instead, the Agreement automatically renewed by its own terms on February 22, 2022, for a one-year term, and it remains in effect until February 21, 2023 ("the Renewal Term").  (*See* Agreement, § 6.1).

59.     Despite amicable demand by Torsh as well as a good faith effort by Torsh to confer and negotiate with AE, as required under Section 5 of the Agreement, AE has never paid Torsh's February 11, 2022, invoice or the amounts due under the Agreement for the current Renewal Term.

60.     In addition, AE has continued to violate its obligations under Sections 2.1, 2.8, 4.3, and 7.1 of the Agreement by developing, marketing, offering for sale, and selling the "My Workshop" platform, which is a professional learning or professional development software platform component developed, upon information and belief, through reverse engineering, disassembling, decompiling, decoding, adapting software contained within the definition of

20

TORSH IP; modifying, correcting, adapting, translating, enhancing, or otherwise preparing or creating a derivative work or improvement of the TORSH Services; and/or through the unauthorized use of Torsh's confidential and proprietary information and trade secrets.

61.     Pursuant to Section 5 of the Agreement, "[i]n connection with a dispute arising out of or relating to this Agreement, the Parties shall attempt in good faith to resolve such dispute promptly by negotiation between the Parties, with their legal counsel if desired." (Agreement, § 5). Section 5 goes on to prescribe certain meeting and waiting requirements before suit may be filed. (*See id.*). All such requirements have been satisfied with respect to the claims set forth in this Complaint.

62.     Torsh has been seriously damaged by AE's activities complained of herein, and unless such activities are preliminarily and permanently enjoined, Torsh will suffer irreparable injury that cannot be adequately calculated or compensated in money damages.

## IV.    CAUSES OF ACTION

### COUNT I:
### BREACH OF CONTRACT

63.     Torsh restates the allegations contained in the preceding paragraphs 1 through 62 as if set forth fully herein.

64.     The Agreement is a valid and enforceable contract.

65.     During the Initial Term of the Agreement, AE breached the Agreement by, among other things:

Sections 2.1, 2.8, 4.3, and 7.1 of the Agreement by engaging in the following conduct:

a.      failing to co-brand the Integrated Solution as required under the Agreement and market the offering with materials identifying the TORSH Services, in violation of Section 3.1 of the Agreement;

b.     failing to promote the Integrated Solution as its exclusive offering containing a professional learning or professional development software platform component, as reflected in its promotion of the My Workshop platform, in violation of Section 2.1 of the Agreement;

c.     engaging in unfair, anti-competitive, misleading, and/or deceptive practices with respect to the TORSH Services and/or Integrated Solution, in violation of Section 2.8 of the Agreement;

d.     upon information and belief, reverse engineering, disassembling, decompiling, decoding, and/or adapting software contained within the definition of TORSH IP, and/or modifying, correcting, adapting, translating, enhancing, or otherwise preparing or creating a derivative work or improvement of the TORSH Services, in violation of Sections 4.3(a) and (b) of the Agreement; and

e.     engaging in the unauthorized use of Torsh's confidential and proprietary information and trade secrets, in violation of Section 7.1.

66.     The Agreement automatically renewed on February 22, 2022, for an additional one-year term.

67.     AE's breaches of the Agreement as outlined above have continued since the Agreement's renewal on February 22, 2022.

68.     In addition, AE has breached the Agreement by failing and refusing to pay Torsh the amounts due to it under the Agreement for the Renewal Term, in violation of Section 2.6 of the Agreement.  Based on the 7,129 Customer Sublicenses available to AE as of the renewal date, Torsh is entitled to charges totaling $356,451.00.

69.     In addition, Torsh has suffered significant damages as a result of AE's various other breaches of the Agreement, for which Torsh is entitled to all monetary damages foreseeable and unforeseeable, direct or consequential.  Notably, Torsh's damages caused by AE's breaches of

Section 7 of the Agreement are not limited by any purported limitation of liability contained within the Agreement.  (*See* Agreement, § 8.3).

70.    Torsh also has suffered and will continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief in the form of an order to return, irretrievably destroy, and refrain from reproducing, distributing, selling, and/or licensing any and all software or technology competing with the Integrated Solution and/or developed by reverse engineering, disassembling, decompiling, decoding, and/or adapting software contained within the definition of TORSH IP; modifying, correcting, adapting, translating, enhancing, or otherwise preparing or creating a derivative work or improvement of the TORSH Services; and/or through the unauthorized use of Torsh's trade secrets and confidential and proprietary information.

71.    Pursuant to Section 5 of the Agreement, Torsh is entitled to an award of reasonable attorneys' fees incurred in connection with this lawsuit and its attempts to enforce the Agreement and its rights thereunder.

### COUNT II:
### VIOLATION OF DEFEND TRADE SECRETS ACT
### 18 U.S.C. § 1832 *ET SEQ.*

72.    Torsh restates the allegations contained in the preceding paragraphs 1 through 62 as if set forth fully herein.

73.    The Defend Trade Secrets Act ("DTSA") defines a "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if: (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives

independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

74.     Upon information and belief, the information and materials AE used to develop its "My Workshop" program – namely, Torsh's web API connecting physical cameras in the classroom to the TORSH Talent platform, information regarding how the API was optimized to enable the transfer of large video files and how the larger files could be effectively stored without jeopardizing software functionality or speed for the end-user, the wireframes regarding the custom applications built by Torsh, and other components of TORSH Talent – constitute "trade secrets" belonging to Torsh within the meaning of 18 U.S.C. § 1832, *et seq.*

75.     This information is not commonly known by or available to the public; derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from the information's disclosure or use; and is subject to the efforts of Torsh that are reasonable under the circumstances to maintain the information's secrecy.  Further, these trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

76.     AE knowingly and willfully acquired, disclosed, and/or used these trade secrets without Torsh's express or implied consent or authorization for the benefit of AE.  AE further used improper means to obtain these trade secrets by breaching its contractual obligations to Torsh to maintain secrecy and/or limit use of the trade secrets.  Additionally, at the time of AE's disclosure and/or use of these trade secrets, it had knowledge that these trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy and/or limit the use of the trade secrets.

77.      As a result of AE's misappropriation of Torsh's trade secrets, Torsh has been damaged in an amount to be proven at trial, and it additionally has suffered and will continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief in the form of an order to return and irretrievably destroy all copies of Torsh's trade secrets currently in AE's possession, including without limitation, all copies of the "My Workshop" software (or similar software under any other name), which, upon information and belief, was developed using and incorporates Torsh's trade secrets.

78.      Upon information and belief, AE's misappropriation of Torsh's trade secrets was willful and malicious, and Torsh should be awarded exemplary damages and attorney's fees under 18 U.S.C. § 1836(b)(3)(C) and (D).

## V.      ENTITLEMENT TO INJUNCTIVE RELIEF

79.      Torsh restates the allegations contained in the preceding paragraphs 1 through 62 as if set forth fully herein.

80.      By reason of AE's acts alleged herein, Torsh has and will suffer immeasurable, and thus irreparable, damage to its business, reputation, and goodwill.

81.      In fact, under Section 7.3 of the Agreement, the parties agreed that "irreparable injury would occur if this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to equitable relief, including injunctive relief or specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity." (Agreement, § 7.3).

82.      The DTSA further provides for injunctive relief "to prevent any actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A).

83.      Upon information and belief, AE intends to continue to engage in the conduct complained of herein unless restrained and enjoined.

84.      Torsh's remedy at law is inadequate.

85.      Torsh is entitled to a preliminary and permanent injunction which orders AE and its affiliates, agents, servants, and employees, as well as anyone acting with its authority or on its behalf, to return, irretrievably destroy, and refrain from reproducing, distributing, selling, and/or licensing any and all software or technology competing with the Integrated Solution and/or developed by reverse engineering, disassembling, decompiling, decoding, and/or adapting software contained within the definition of TORSH IP; modifying, correcting, adapting, translating, enhancing, or otherwise preparing or creating a derivative work or improvement of the TORSH Services; and/or through the unauthorized use of Torsh's trade secrets and confidential and proprietary information, including without limitation, the "My Workshop" platform (or similar software under any other name).

## VI.    **JURY DEMAND**

Torsh requests a trial by jury for all issues so triable.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Torsh requests the following relief:

a.      That judgment be entered in favor of Torsh and against AE as to each of the above Counts and the relief requested therein;

b.      That Torsh be awarded all relief to which it is entitled under the Agreement and under 18 U.S.C. § 1836, *et seq*.;

c.    That Torsh be awarded monetary damages incurred as a result of AE's breaches of contract, including all damages foreseeable and unforeseeable, direct or consequential, and without limitation, actual damages, lost profits, incidental damages, and consequential damages;

d.    That Torsh be awarded its reasonable attorneys' fees, costs and expenses, and pre- and post-judgment interest;

e.    That Torsh be awarded monetary damages incurred as a result of AE's misappropriation of trade secrets, pursuant to 18 U.S.C. § 1836(b)(3)(B), including but not limited to, actual damages, damages for unjust enrichment not otherwise addressed in computing actual damages, interest, and costs;

f.    That Torsh be awarded exemplary damages and attorney's fees and expenses for AE's willful and malicious misappropriation of trade secrets, pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D);

g.    That AE, its officers, agents, servants, employees, attorneys, and anyone in active concert with, aiding, assisting, and/or enabling AE, be forthwith preliminarily enjoined and ordered to return, irretrievably destroy, and refrain from reproducing, distributing, selling, and/or licensing any and all software or technology competing with the Integrated Solution and/or developed by reverse engineering, disassembling, decompiling, decoding, and/or adapting software contained within the definition of TORSH IP; modifying, correcting, adapting, translating, enhancing, or otherwise preparing or creating a derivative work or improvement of the TORSH Services; and/or through the unauthorized use of Torsh's trade secrets and confidential and proprietary information;

h.      That AE be directed to file with this Court and serve on Torsh within thirty (30) days after the service of an injunction, a report in writing under oath, setting forth in detail the manner and form in which AE has complied with the injunction;

86.      At the conclusion of trial, that AE, its officers, agents, servants, employees, attorneys, and anyone in active concert with, aiding, assisting, and/or enabling AE, be forthwith permanently enjoined and ordered to to return, irretrievably destroy, and refrain from reproducing, distributing, selling, and/or licensing any and all software or technology competing with the Integrated Solution and/or developed by reverse engineering, disassembling, decompiling, decoding, and/or adapting software contained within the definition of TORSH IP; modifying, correcting, adapting, translating, enhancing, or otherwise preparing or creating a derivative work or improvement of the TORSH Services; and/or through the unauthorized use of Torsh's trade secrets and confidential and proprietary information;

i.      That AE be directed to file with this Court and serve on Torsh within thirty (30) days after the service of an injunction, a report in writing under oath, setting forth in detail the manner and form in which AE has complied with the injunction; and

j.      That Torsh be awarded such other and further relief as this Court deems just and proper.

Respectfully Submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

BY: _____*s/ Laura E. Carlisle*_____
LAURA E. CARLISLE (33760)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile: (504) 636-4000
E-mail: lcarlisle@bakerdonelson.com

*-and-*

ADAM S. BALDRIDGE, T.A. (TN #023488)
(*Pro Hace Vice Forthcoming*)
NICOLE BERKOWITZ RICCO (TN #03546)
(*Pro Hace Vice Forthcoming*)
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone:  (901) 526-2000
Facsimile:  (901) 577-0866
E-mail:  abaldridge@bakerdonelson.com
E-mail:  nriccio@bakerdonelson.com

**ATTORNEYS FOR PLAINTIFF, TORSH INC.**